H. Gray, J.
When the framers of the act for the establishment of the Metropolitan District had the subject under consideration, they undertook to make available to the district the experience and skill of the then existing police force in the cities of New York and Brooklyn, then in office under the act of April, 1853, by leaving them in office, changing somewhat their .designation, and adding to their duties by enlarging their sphere of action. To carry out that design, it was enacted that, from and after the passage of the act, captains of police in New York and Brooklyn should be designated inspectors or captains of police; lieutenants and assistant captains should be designated as sergeants of police, and perform duty concur *191 rently with the sergeants then in office, until the hoard should regulate the proper number of such sergeants according to the terms of the act; those who had been designated as police, were thereafter to be designated as patrolmen. The then present wards of those cities were made police precincts within the district, until new ones should be made by the board of police. It was further provided, that the police in the cities of Mew York and Brooklyn should continue to do duty under j laws existing at the time of the passage of the act, and according to the regulations of the departments of Mew York and Brooklyn, until after the first meeting of the new board of police, when they should hold office and do duty under the provisions of the act thereby enacted.
These provisions alone are, to my mind, quite sufficient, not only to protect the relator from harm in a suit against him for any act done by him which might have been lawfully done by ( any police or patrolman, but to defend him, in any form, against the charge of being a usurper of the office. This view of the case gathers strength from a subsequent provision giving authority to the board to remove from office any of the present members of the police department of Mew York and Brooklyn who could not read and write the English language, or who was not a citizen of the United States, or who had not resided within the Metropolitan District during the term of five years.
But it is claimed, that because the relator did not take the oath of office after the passage of the act of the 15th of April, 1857, establishing and providing for the government of the Metropolitan Police District, he was not from that time a legal incumbent of the office, and, therefore, was not entitled to judgment in his favor. This position assumes that he was not an old officer, whose sphere of action had simply been enlarged ; by the act referred to, but that he was appointed by that act ’ itself, and hence bound to take the oath of office. In support of this position, reference was made to an expression used by a learned judge of this court in the case of The People v. Draper (15 N. Y., 540), involving the constitutionality of that act, in which he said: “ If it was a valid, organization, the offi *192 cers appointed by this bill are not county or city officers, but district-officers.”' The question in that case was, whether the appointment of that force, in the manner specified by the act, was in conflict with the Constitution; and if he had said, ‘under the bill,’ instead of ‘by it,’ nothing said by him on that occasion would be referred to as authority in this case. That a just interpretation of all he did say will not- justify the conclusion that he regarded the relator as appointed to office by that bill, is, to my mind, quite clear; and, without the aid of that ^expression, it may as well be said that, for every new duty | imposed, either by enlarging his sphere of action or by requir(ing obedience to a new superior, he must take an oath. Without an unjust interpretation of the expression referred to, there is not, in my judgment, a plausible pretext for saying | that, because the Legislature found the relator in office, and i left him there, by an unequivocal expression of their design to do so, without taking further notice of him than to change his designation, enlarge his sphere of action, and enjoin obedience to a new superior, he was, by that act, appointed to office or required to take anew his oath of office. It may as well be said that," for every new duty imposed, either by "enlarging the jurisdiction of an official incumbent, or requiring his obedience to a new superior, he forfeits the office he has, unless j he add, to the obligation of an oath already taken, another, ¡ that he will discharge his duty within his enlarged jurisdiction, and render obedience to his new superior. .
It was urged that because the relator became by the act an officer' of the Metropolitan Police District, and was no longer one of the city of Mew York alone, he became thereby a different officer, and hénce a new one; and was, therefore, bound to take the oath of office. I do not' perceive the force of this position. Every office, to whose bailiwick or jurisdiction territory is added, becomes an officer of that territory, and is, in no respect, a new officer.
Unless, therefore, the relator has withdrawn or resigned from the police force, ór has been legally dismissed therefrom, he was entitled to bé restored to the position in which the law *193 left him, and where the new board of police found him. That he resigned is not pretended; and it is nowhere to be found in ] , the verdict of the jury that he has withdrawn. But it is insisted that because he and the captain of the old police force, who had been for ten years a captain of that force, under whose command the relator was when the act of 1857' was passed, believing that act to be in conflict with the Constitu- . tion, did not recognize the new police board, and -refused to act under it until this court should pass upon its constitutionality, this was, per se, a withdrawal from the force, notwith- } standing his captain obeyed all general orders that issued from the commissioners under the act of 1853, while the question as to the constitutionality of the act of 1857 was pending before this court, and in the meantime made daily returns to the chief of police under that act; and that the members of the old force, including ■ the relator, under their old captain, were the only police force on duty in the 14th ward of the • city of Hew York, and did all the police duty of that ward until the 1st of July, 1857: and as soon it was understood that the constitutionality of that act had been determined by this court, that whole force, including the relator, surrendered, and the relator reported himself for duty.
When the act to establish the Metropolitan District was passed, much doubt was entertained as to its constitutionality. Eminent members of the legal profession, upon full consideration, differed in opinion as to its validity; and, as we have - seen, this court was divided upon that question. I do not 3 refer to this in derogation of the fundamental principle, that ■ “ignorance of the law, which every man is presumed to know, does not afford an excuse,” but as a fact in history of which we should avail ourselves in the interpretation of the relator’s acts relied upon to demonstrate his withdrawal from the police force. That he was honest in his conviction as to the invalidity of the law we have no reason to doubt; indeed the jury, have so far sustained him: that he intended to stand where the act of 1857 left him, there is as little doubt. He was then a policeman of the 14th ward of the city of Hew York, which *194 by that act remained a police precinct until new ones should be formed by the board. No new ones were formed: at least' the verdict does not show it. He was also, by the act, to do duty according to the regulations of the police department of the city of New York, until after the first meeting of the new board, when they were to do duty under the provisions of the new act. There is no complaint that in his watchfulness over his ward or precinct, he did not do every duty which the law exacted of him, except that while in the performance of that duty, being misled by his own erroneous judgment or the ad- —> vice of others, or both, he did not recognize the rightful sovereign. This certainly does not prove that he withdrew from the force; but, on the contrary, that he adhered to it. The whole case, then, amounts to this: the Metropolitan District received and was benefited by the police services of the relator, who, during the whole period of his services, is not found to have disobeyed any general or special order of the board of police, or the command of a superior; and notwithstanding he was, during his service, regarded by the board, and treated by them as a patrolman, they now insist that because he did not, while thus serving, recognize the Metropolitan Board of Police as the rightful power and act under it, he was, what? not a present insubordinate, but an absentee who had withdrawn from the force.
There is another ground upon which I think such a defence ought not to prevail. Before this relator sued out his writ the ' defendants passed a resolution that such of the old force as had not been dismissed in conformity to law, were thereby declared members of the Metropolitan Police of the city of New York, and entitled to duty, and to be duly paid as such. That the relator had not been dismissed in conformity to law, is clear. This resolution, therefore, declares the relator to be a member Of the force, and concedes to him the right to do duty and to be paid therefor. It may be said that this resolution was not intended to extend to the relator, because he had been removed, though not in conformity to law. Why then employ the language unless it was intended to include all those *195 who had not been legally removed ? That the point was in the mind of the mover of this resolution is clear beyond a doubt, or a place would not have been provided for those who had not been dismissed except in conformity to law.
But it was urged that because the relator had been an insubordinate in his refusal to recognize the rightful board and act under it, he ought now to be removed, notwithstanding his allegiance to it ever since the decision as to the validity of the law by this court, and hence he should not now be restored. It may be that his erroneous opinion as to the validity of the law ought not to have excused him had he been arraigned for his refusal to recognize and act under the rightful board. But with that question we have nothing to do. Our province is simply to determine whether he was a member of the police force, and if so, whether he has been removed, or has withdrawn therefrom; and although he may now deserve to be removed, he has the right to be heard before the board upon j whatever causes of removal may be alleged against him. But if it was competent for this court to consider that question, we should be slow to act in the face of the defendants' resolution of condonation.
I am of opinion that the judgment should be affirmed.
Allen, J., concurred in this opinion.
Comstock, J.,
was also for affirmance of the judgment. It may be conceded (he observed in substance), that the office of patrolman, under the Metropolitan Police act, is not identical with that of policeman under the system superseded by that statute. The difference is a territorial one, the duties being the same. If the office in this sense is to be regarded as a new one, the mode of filling it is not provided for in the Constitution, and the Legislature had power to fill it. The oath of office could also be dispensed with at the pleasure of the Legislature, and the policemen of the old system could be' made patrolmen in the new organization without any acceptance or affirmative act on their part. This I think is what *196 was done. Looking at several provisions of the act I am clear that no oath of office was required, and that these men were ) transferred to the new force, and so placed in office, by the Ü mere will of the Legislature. They were, therefore, in possession of the office in the same absolute sense in which any person holds an office, who receives and accepts a commission from the appointing power, takes the oath and enters upon the duties. In a word, I do not regard the statute as a mere tender of office to the old policemen, to be accepted or not, and requiring acceptance on their part. The act in the same breath created the office of patrolman, so far as it is new, and <[ transferred to it absolutely a class of incumbents who had | filled analogous situations in the former system. This was i within the power of the Legislature.
The question before us is, therefore, one of abdication, and not of acceptance, and I am satisfied that there has been no abdication. The relator at all times performed, or was ready to perform, police duty, although he mistook the warrant or authority under which he acted. But that mistake cannot be ¡¡ imputed to him as an intention to retire from the office which i he" held. He was guilty of insubordination; but while that ' may be good cause for a removal," it is not resignation.
S. B. Strong, J.
The substantial issue raised by the pleadings was, whether the relator had not, by continuing to act (under the old board, after the passage of the Metropolitan i Police act, and omitting to take a new oath of office, forfeited any claim to be considered a patrolman of the new district. The new district was an extension of the old one, and comprehended the counties of Kings, Richmond and Westchester, as well as the city and county of Hew York. It changed the names of the various officers composing the active and efficient force; but, as was said by Judge Denio, in the case of The People v. Draper (15 N. Y., 532), “the superintendent of police, captains, sergeants and patrolmen mentioned in the Metropolitan Police bill are officials of the same character, possessing substantially the same powers and authorized to *197 perform the same functions as those heretofore existing, under somewhat different names.” The 6th section provides that the offices created for the police force shall be severally filled by appointment from the board of police in the mode prescribed by that act; but that must have reference to such as are newly introduced into the force, as the latter part of the 32d section, having reference to the same subject, is in the following words: “The police force in the cities of ¡New York and Brooklyn, officers and patrolmen, shall continue to do duty under existing laws, at the passage of this act, and according to regulations of the department of ¡New York and Brooklyn, until the first meeting of the board of police under this act, when the said police shall hold office and do duty under the — provisions of the act hereby enacted; and as members of the Metropolitan Police District’ hereby constituted.” The “patrolmen” mentioned in this provision are evidently the policemen appointed under the act of 1853, as there could be no more patrolmen until after the first meeting of the new board, and the direction was as to their conduct previous to said meeting.
Besides, the expression that they should continue to do duty until the meeting, under previously existing laws, when they should hold office and do duty under the hew act as members of the Metropolitan Police District thereby constituted, clearly refer to and include the policemen who were in office when the new act was passed. The defendants contend that this was a new and legislative appointment of officers. The Legislature has frequently appointed officers newly created, and probably has the power to do so when not restrained by the Constitution. But this does not purport to be a new appointment, but is in terms a mere continuance in office. The officers designated were to Continue to do the | same duties as before, and to hold in effect the same office, ^ but under a different title. The policemen under the old law and the policemen under the new one were, as was truly said by Judge Dentó, officials of the same character, possessed of the same powers, and authorized to perform the same functions. Those were the most important particulars connected *198 with the office, and, in conjunction with the unequivocal declarations in the statute, are sufficient to indicate its continued identity. Nor was that identity destroyed by the changes in the rules of procedure or the extension of the district. The alterations as to the manner in which the duties were to be discharged were principally formal, anfi were no greater than such as are frequently adopted when there is no pretence of t a change of office. The enlargement of the district merely 1 extended their sphere of action. The patrolmen were not to be appointed indiscriminately from the entire district, but quotas were to be selected from the different localities ;* as many from the county of New York as might be determined upon by its board of supervisors; as many from the city of Brooklyn as should be determined upon by its common council; as many from the towns in the county of Kings as might be determined by the supervisors of such towns, and as many from each of the counties of Richmond and Westchester as might be determined by the supervisors of those counties respectively. And pntil otherwise provided for, the quota of patrol force for the county of New York and for the county of Kings should be of the number of patrolmen then existing by law in the cities of New York and Brooklyn;' and each of the localities thus specified in the act was to pay for its own policemen. (§6.)
Thus, then, the supervisors (except in Brooklyn the service was to be performed by the common council) were to determine the number to be appointed, in their respective counties, and they were to be selected from and paid by their own counties. It seems to me that, in consequence of these pro *199 visions, each county preserved its individuality as to those officers. They may not have been county officers as to their mode of appointment, as was decided by this court in the case of The People v. Draper, and as to the extent of territory in which their services were to be performed; but they were such in all other important particulars; and, therefore, the Legislature were consistent in providing that the occupants of the old offices should continue to hold them under a new designation.
If, then, the relator was entitled to hold the office of patrolman when the act of April 15, 1857, went into operation, no i personal acceptance by him was necessary. The act itself: continued the official tenure. It has never been held, nor could it be with any reason, that a mere change of the name of office, or of its duties as long as they remain substantially the same, so far ousted the occupant from office as to require his direct assent to his restoration. He would retain the office (while living) until the expiration of the term, if there should be any, or his removal from it, or his resignation and possibly its acceptance.
It was contended, however, that the relator, by his conduct,") vacated the office. The Revised Statutes declare in what cases an office shall become vacant. (1 R. S., 122, § 34.) They provide that every office shall become vacant on the happening of either of the following events: (1) the death of the incumbent; (2) his resignation; (3) his removal from office; (4) his ceasing to be an inhabitant of the State, or, if the office be local, of the district, county, town or city for which he shall have been chosen or appointed, or within which the duties of his office are required to be discharged; (5) his conviction of an infamous crime, or of any offence involving a violation of his oath of office; (6) his refusal or neglect to take the oath of office within the time required by law, or to give or renew any bond within the time prescribed by law; or (7) the decision of a competent tribunal declaring void his election or appointment. The only charges brought against the relator which could, if true, bring his case within this category, are, *200 i first, that he neglected to take the oath of office within the time required by law; and, second, that he, in effect, resigned the office.
It is to be inferred, although I do not see it distinctly stated in the special verdict, nor was it mentioned in the charges preferred against the relator before the police board, that he has never taken the oath of office under the Metropolitan Police act. If I am right in supposing that the act continued him in his old office, no new oath of office was necessary, unless it was positively required by the statute. The 30th section provides that the board of police shall make suitable j provisions for the taking, by members of the police force, of an oath of office, and the registry of the same in a book to be kept for that purpose. It does not appear very clearly whether this provision has reference to all the members, or only to those who might be newly appointed. The reasonable inference would seem to be, that it included only those who had not previously taken the oath of office. But if it referred to all, | they were not required by law to take the oath until the police i board had made suitable provisions on the subject, and had furnished a book in which it was to be registered; and it does not appear, nor is it alleged in the return by the defendants to the alternative mandamus, that the board had performed either of those services. There was not, therefore, any neglect or refusal of the relator to take an oath of office.
The defendants do not directly allege that the relator resigned 'his office, but they say that he refused to take or hold office under the new act, or under the board of police thereby established, which they probably deemed equivalent to a resignation. The 12th section of this act provides that nomember of the police force, under penalty of forfeiting the ^ pay which may be due to him, shall withdraw or resign from i the police force, unless he shall have given one month’s notice thereof in writing to the General Superintendent of Police. This would seem to provide the manner in which, and in which only, a resignation can be made; and there is no pretence that the relator thus resigned. It was contended, however, that *201 the relator had, by his conduct, abdicated the office, which was, in effect, a resignation; and the case of King James II. of England was cited to show that the abdication created a vacancy. But that unfortunate and misguided monarch had "abandoned the country, and ceased to perform any of his royal functions; and yet it was doubted by many eminent men of the time whether he had actually vacated the kingly office, and it was supposed that the Parliament, in resolving that he had, acted rather from a great state necessity than from any well-settled principle. In the case under consideration, however, the relator did'not abandon his district, nor did he cease to perform the actual duties of his station. Indeed, it would seem, from the special verdict, that, for a long period after the passage of the new act, he could not have performed any police duty in his (the 14th) district in any other manner.
The special verdict states “that the members of the old force, including the relator, under the command of Captain Kissner, did the police duty of the fourteenth ward, up to the last of June or first of July, 1857, and were the only police force on duty in the fourteenth ward.” It was not in the power i of the relator to reorganize the district, and the omission to ; place it in a proper condition for the performance of any duties under the new act was attributable to the higher powers, and i not to him. The only charge which was intended to be brought against him before the Board was, that he had neglected to obey an order to report for duty at 88 White street, on the 18th day of June, at 8 o’clock, p. M. If he had been named ¡ in the charge, and it had been proved against him on a trial" of which he had been duly notified, and he had omitted to make any defence, such disobedience might have been a suffi- . cient cause for dismissal. But, as has been already indicated, ¡ the irregularity of the proceeding deprived it of all effect. It was not even in proof that the charge was well-founded. Besides, according to the decision in the case of Van Orsdall v. Hazard (3 Hill, 243), a refusal to serve, although without ) sufficient reason, is not, per se, a forfeiture of an office. The I judge who delivered the opinion of the court in that case, *202 quoted the decisions in Lyon v. The Commonwealth (3 Bibb, 430), and Rex v. Exeter (Comb., 197), that if an officer should remove beyond the district to which his office related, for the purpose of temporary occupation, and that even for months, if he had done so with an intention to return and continue his -former domicil, th^t would not of itself vacate his office. If, therefore, the case had shown, more clearly than it does, that the relator had neglected or refused to perform some official duty, that would not have established the charge that he had vacated his office.
The principal charge against the relator, and that issue has probably caused the entire controversy between him and the defendants, is, that under the advice of the late mayor of the ¡ city of New York and the captain of his district, he did not I recognize the Metropolitan Police law, and, in association with a body of several hundred men, who belonged to the police of the city of New York, under the act of April 15, 1853, refused to act under the new law, but continued to obey all general orders that had issued from the old board. This the defendants seemed to consider as “flat rebellionand their counsel compared the conduct of the relator with that of the traitor Arnold, of revolutionary notoriety. But there seems to be a wide difference in the character of the two transactions. Arnold rebelled and fought against his country, which had appointed him to a high and confidential office. The relator did not rebel against or dispute the power of the people, whose officer he was; but he denied the authority of persons alleging themselves to be the people’s agents. His conduct resembled (that of the boy who, having found a valuable diamond, refused )to give it up to the person demanding it, on the ground that /he did not know that said applicant was the true owner. It was held that said refusal was, under the circumstances, rea(sonable, and did not amount to a conversion, although it turned out that the person making the demand was the actual owner. There is no pretence that the relator acted willfully wrong. lie was advised by the board from which he had originally received his appointment, and by the captain of his district under whose *203 immediate orders he had been placed, that the statute purporting to establish the new board was unconstitutional and void. He, no doubt, ascertained that the same opinion had been expressed by learned lawyers. The question involved was a | doubtful one, as was subsequently shown by the diversity of j opinion among eminent judges. Between the old board and the new one, the policemen were subjected to a serious dilemma. If they acknowledged the authority of the old board, \ and it should turn out that the act of 1857 was constitutional, j they were in imminent peril of losing their position; and if j they acknowledged the authority of the new board, and the; act constituting it should be adjudged unconstitutional, they; would encounter the same peril. Under such circumstances/ it would seem to be a hard rule to hold them responsible for a simple error in judgment. It might be that public necessity might require prompt action by the new board against the recusants; and, in that case, they could apply the remedy by trials and removals. But, if they neglected to organize a dis-; trict under the new law, and thereby reduced the policemen • to the necessity, either of living idle or of acting under the old act, and those officers chose to act under the old law, pursuant to the advice of their superior officers, and from an honest belief that such advice was correct, until a final decision of the question as to which of the two boards they owed obedience, and, when that decision was pronounced, promptly offered to submit to the recognized board; it seems to me that, although their conduct was not strictly justifiable, yet it was"j excusable, and that it could not imperatively call for their ejec- I tion from office. Certainly, it could not amount to a forfeiture I without a trial.
It appears, from the special verdict, that the relator performed actual duty as a policeman, or a patrolman, until the, Sd day of July, 1857, and that he then promptly tendered his services as a patrolman to the new board, which were declined, i He received his pay up to the 26th of June, but has received none since. He is, I think, fairly entitled to a restoration to *204 the office from which he has been irregularly ejected, and to the emoluments appertaining to said office.
The judgment awarding the mandamus must be affirmed
Selden, J., was in favor of affirmance; Johnson, Ch. J., Denio and Gboveb, Js., dissented: the former delivered their opinion:

 The learned judge must be understood here as giving his construction of the statute, and not as citing its language. The section referred to declares that the police force shall consist of “so many police patrolmen as may be determined upon by the Board of Supervisors of the county of New York, to be appointed as aguóla of the police force to be paid for by said county’’ and uses the same terms in respect to each of the other territorial divisions of the district; but nowhere does the act, in terms, state any other qualification in respect to residence, than that the policemen shall have resided, during the five years next preceding their appointment, “ within the said the Metropolitan Police District.” reporter.